UNITED STATES of America, Appellant,

v.

The AGIOI VICTORES, her engines, tackle, apparel and furniture, N. J. Pateras Sons, Ltd., as owner of the Agioi Victores, N. J. Pateras Sons, Ltd., as general agents of the Victores Shipping Corporation of Liberia, Appellees.

No. 13911.

United States Court of Appeals Ninth Circuit.

Nov. 23, 1955.

Warren E. Burger, Asst. Atty. Gen., Leavenworth Colby, Sp. Asst. to Atty. Gen., J. Stewart Harrison, Atty., Dept. of Justice, San Francisco, Cal., Keith Ferguson, Sp. Asst. to Atty. Gen., C. E. Luckey, U. S. Atty., Portland, Or., for appellant.

Wood, Matthiessen, Wood & Tatum, Erskine Wood, Lofton L. Tatum, Portland, Or., for appellees.

Before MATHEWS and POPE, Circuit Judges, and BOLDT, District Judge.

POPE, Circuit Judge.

In this admiralty case in rem, the United States sought to recover from the ship Agioi Victores damages sustained by its dredge Multnomah in a collision with the ship. N. J. Pateras Sons, Ltd., general agent and claimant of the Agioi Victores, which was owned by a corporation of Liberia, filed a cross-libel. An interlocutory decree was entered dismissing the libel of the United States and adjudging the cross-libelant entitled to recover for damages to the ship.

Upon its appeal here the United States asserts first that the district court erred in rejecting the contention made below that the dredge was a "piece of plant, floating or otherwise", within the meaning of those portions of the Rivers and Harbors Act of 1899 which are set forth in Title 33 U.S.C.A. §§ 408, 411 and 412, and which appear in the margin.[1] The collision here in question occurred when the Agioi Victores, moving down the Columbia River outbound for sea, struck the pontoon pipeline of the dredge, went through it and then sideswiped the dredge which was anchored on the northern edge of the Fisher Island ship channel. The dredge had been used by the

1. "§ 408. Taking possession of, use of, or injury to harbor or river improvements. It shall not be lawful for any person or persons to take possession of or make use of for any purpose, or build upon, alter, deface, destroy, move, injure, obstruct by fastening vessels thereto or otherwise, or in any manner whatever impair the usefulness of any sea wall, bulkhead, jetty, dike, levee, wharf, pier, or other work built by the United States, or any piece of plant, floating or otherwise, used in the construction of such work under the control of the United States, in whole or in part, for the preservation and improvement of any of its navigable waters or to prevent floods, or as boundary marks, tide gauges, surveying stations, buoys, or other established marks, nor remove for ballast or other purposes any stone or other material composing such works: Provided, That the Secretary of War may, on the recommendation of the Chief of Engineers, grant permission for the temporary occupation or use of any of the aforementioned public works when in his judgment such occupation or use will not be injurious to the public interest."

"§ 411. Penalty for wrongful deposit of refuse; use of or injury to harbor improvements, and obstruction of navigable waters generally. Every person and every corporation that shall violate, or that shall knowingly aid, abet, authorize, or instigate a violation of the provisions of sections 407, 408, and 409 of this chapter shall be guilty of a misdemeanor, and on conviction thereof shall be punished by a fine not exceeding $2,500 nor less than $500, or by imprisonment (in the case of a natural person) for not less than thirty days nor more than one year, or by both such fine and imprisonment, in the discretion of the court, one-half of said fine to be paid to the person or persons giving information which shall lead to conviction."

"§ 412. Liability of masters, pilots, and so forth, and of vessels engaged in violations. Any and every master, pilot, and engineer, or person or persons acting in such capacity, respectively, on board of any boat or vessel who shall knowingly engage in towing any scow, boat, or vessel loaded with any material specified in section 407 of this chapter to any point or place of deposit or discharge in any harbor or navigable water, elsewhere than within the limits defined and permitted by the Secretary of War, or who shall willfully injure or destroy any work of the United States contemplated in section 408 of this chapter, or who shall willfully obstruct the channel of any waterway in the manner contemplated in section 409 of this chapter, shall be deemed guilty of a violation of this chapter, and shall upon conviction be punished as provided in the preceding section, and shall also have his license revoked or suspended for a term to be fixed by the judge before whom tried and convicted. And any boat, vessel, scow, raft, or other craft used or employed in violating any of the provisions of sections 407, 408, and 409, of this chapter shall be liable for the pecuniary penalties specified in the preceding section, and in addition thereto for the amount of the damages done by said boat, vessel, scow, raft, or other craft, which latter sum shall be placed to the credit of the appropriation for the improvement of the harbor or waterway in which the damage occurred, and said boat, vessel, scow, raft, or other craft may be proceeded against summarily by way of libel in any district court of the United States having jurisdiction thereof."

Army Engineers Corps in dredging the ship channel, but at the time in question it was Saturday night, and it was anchored at the edge of the cut to lie idle over the week-end. Alluding to that portion of § 408 which makes it unlawful to injure "or in any manner whatever impair the usefulness of any sea wall, bulkhead, jetty, dike, levee, wharf, pier, or other work built by the United States, or any piece of plant, floating or otherwise, used in the construction of such work", the Government here argues that the ship channel was an "other work" within the meaning of this section, and that the effect of the section is to create a cause of action in admiralty for compensatory damages irrespective of negligence.

Appellees say that when § 408 is read with §§ 411 and 412 with their provisions for fines and imprisonment the statute as a whole must be considered to be penal in character, and that the words of § 408 must be construed to contemplate a conscious, willful act, not an act merely negligent, much less an act neither intentional nor negligent. While this suggestion is not without force, we find it unnecessary to pass upon it, for we think it clear for other reasons that § 408 does not apply to this case. A dredged channel has no resemblance to any of the works specified in the section. The listed items (sea wall, bulkhead, jetty, dike, levee, wharf, pier), are all physical structures. The rule of ejusdem generis would exclude the channel from the category of "other work". This is made most clear when we note that the language used says it shall not be lawful "to make use of" the listed works "for any purpose", providing however that the Secretary of War may, on the recommendation of the Chief of Engineers, "grant permission for the temporary * * * use of any of the aforementioned public works". Obviously this is not referring to a ship channel, for it would be absurd to suppose one could not "make use of" it without this special permission. We agree with the statement of the trial judge that the statute "does not apply under the circumstances here presented".

Testimony as to what transpired before and at the time of the collision was given by witnesses in open court. The court found that the Agioi Victores was handled and navigated in the manner alleged and set out in detail by the cross-libelant, and "There was no negligence on the part of the Agioi Victores." It found that "the man on watch on the dredge did not keep an alert and vigilant lookout and that the dredge was negligent in not giving fog signals sooner and that the proximate cause of the collision was the dredge's failure to give timely warning of its position." We are asked to overturn these findings. The argument that we should do so starts with the propositions (a) that the Agioi Victores as a moving vessel coming into collision with the anchored dredge had the burden of overcoming the presumption that she was at fault, and (b) that a further presumption of fault on her part arises from her failure to produce her log books, as demanded by libelant, and her failure to produce the testimony of certain officers, engineers and seamen who were on duty at the time of the collision.

The Agioi Victores was in charge of one Caples, a Columbia River pilot who was navigating her as she moved down river. The trial judge heard his testimony, and observed him as he related in minute detail exactly how he handled the ship. He told how, as he proceeded he observed a haze ahead, and though visibility was better than a mile, he slowed down and from this point on was blowing fog signals regularly at one minute intervals. Farther on, at a point which he identified, he stopped the engines anticipating that the fog might get heavier, and intending to anchor at the first place that was possible. The ship then drifted on a 2.4 knot current for 14 or 15 minutes. At this point the channel makes a slight bend to the left, and to give the ship steerage way he "gave her

**574**

slow ahead" for approximately 30 seconds. He stopped the engines, continued to drift, and at that time, as he observed heavy fog ahead, he heard the first whistle from the dredge ahead, "and it was very close". He ordered engines full astern. Following the dredge's first whistle there were four or five exchanges of whistles when the dredge's pipe line loomed up under the ship's bow. At this point the dredge came in sight. Caples described the manner in which he maneuvered the ship to avoid hitting the dredge squarely. It was sideswiped.

With respect to the dredge the evidence showed that according to the latest information available to the pilot from the U. S. Engineers she was supposed to be in the part of the channel where the one-mile visibility still remained. When she was not found there, and the pilot approached the place where the heavy fog began, and he heard no whistle, he assumed the dredge had moved down to a section of the channel far below where it actually was. Only one member of the dredge crew was on duty at the time. He was supposed to act as lookout, blow whistles, and act as watchman. Although the fog was very thick, and it was nearly 8:30 P. M. on November 1, this man was below playing cards. He was having a cup of coffee at the entrance to the galley when he heard a whistle from the Agioi Victores. He then went up and blew the first whistle that the pilot heard as above described, continuing the exchange of whistles mentioned above.

We find nothing in the record to suggest that the trial judge did not give appropriate weight to the presumptions upon which appellant relies. It is plain that upon a consideration of all the evidence he found that the presumptions had been overcome. In reviewing this judgment of a trial court, sitting without a jury in admiralty, we may not set aside the judgment below unless it is clearly erroneous. McAllister v. United States, 348 U.S. 19, 20, 75 S.Ct. 6. Particularly in view of the superior advantage which the trial judge had because of his opportunity to see and observe the witnesses, we are of the opinion that the court's findings had abundant support in the record.

Affirmed.